May it please the Court, I'm Steve Epstein and it is my privilege to represent the Law Offices of John Juliano. Your Honor, the Peter Priest case decided by the North Carolina Court of Appeals last November and cited to this Court by defendants as subsequently decided authority confirms our position that Robertson v. Harris Court controls the outcome of this case. Recall that in Robertson, the North Carolina Court of Appeals cited Rules 027 of the preamble of the revised Rules of Professional Conduct, which states that the rules do not augment substantive duties of lawyers. You don't mean control, because you know that's not the Supreme Court of North Carolina's decision. Understood completely, Your Honor. In terms of, if this case were being- I was not going to be that way. I was on the Court of Appeals for a couple of times. I thought my decision would be controlled. Well aware of that. It's the Supreme Court. We follow the law of the state. The Court of Appeals doesn't exactly give us that. Correct, Your Honor, but in terms of the decisional authority on this particular question, the decisional authority that we have currently is made up of essentially two important cases decided in 2014 and 2015. Both coincidentally written by Judge Linda Stephenson. The Robertson case and then the Peter Preece case that was cited by my opposing counsel after they had submitted their brief. So those are the two decisions. And what's important about those two decisions is that both of them came to the exact same conclusion regarding whether or not one could defensively rely on Rule 1.5 of the Rules of Professional Conduct to avoid the payment of an attorney's fee. That's the critical question here because they are, in fact, relying on Rule 1.5. But you've got an interesting set of facts here. Absolutely, Your Honor. And you've got a lot of moving parts here that don't connect in that way. I don't know who the New York lawyer was. He found you to do this case. He probably wish he'd found you the first time around to do this case. But I think aren't the facts here a little different? I mean, when you have a law firm that's set up, you come to them, they get split up, one lawyer leaves. Then you ultimately end up with all of these facts with that lawyer you left, and there's no connectivity back with the one here. And then in the meantime, he sends in an invoice of $2,000. I don't know why he did that. But that's what he's entitled to. So isn't a different set of facts a little bit more removed? Well, Your Honor, that's why we do not have a breach of contract claim. Had this situation arose where Mr. Jensen remained at his original law firm and prosecuted the hazard case to its conclusion, while there, this would be a breach of contract case based upon the referral fee provision or the fee division within that specific contract. It's out of cue, Ross. Can lawyers contract to get paid based on the referral alone? Yes, Your Honor. So I'll get to that. I just wanted to know that answer. Absolutely. So let me get to that, and then I'll go back to why we shouldn't. What was one third of the recovery? That was the fee division, and the ethical rules are very clear on when a fee division between two law firms is permitted. And I'll talk about that, Your Honor. Roberts and Peter Priest, I'm going to say, make very clear that under comment 12, rule 1.5, the tribunal should not in any way look at this question, because that is a question that is controlled under comment 12 by application of law to fact, not by an application of rule 1.5. In other words, it's a state bar disciplinary matter, not a matter for a court resolving disputed attorneys' cases. But if this court nevertheless concluded, as did Judge Eagles in the Middle District, that this court is supposed to look at rule 1.5 and determine whether under rule 1.5 this was a permissible division of fees. It was. Your Honor, a permissible division of fees occurs under the rules when one of two things occurs. Either there is proportionality between the work of the two different law firms. That is one way. Or second, under rule 1.5. Do I maintain that here? I'm sorry? You don't maintain that here? Absolutely not, Your Honor. Absolutely not. But the second is what we do maintain, which was the assumption of joint responsibility. If there is joint responsibility, no different than one partner would owe to another partner in a law firm. If somebody in my law firm is prosecuting a personal injury case, I have responsibilities to make sure that that case is handled ethically and responsibly, even though I have nothing whatsoever to do with that case. That joint responsibility existed between the New York lawyer and Mr. Jackson? Yes, Your Honor, and I'll tell you why it did. He didn't even know about this case. He didn't even know what was going on. He didn't even know it had been settled. He never signed a complaint or anything on it. I mean, it's an unusual case. I mean, I'm just talking straight up. I'm just thinking, how would you do this differently? And you would think if you sent a client to North Carolina, you wouldn't have to wait until after it's already been tried and everything. They didn't see this big verdict that says, whoa, I'm entitled to some of the fee. What happened in that case? Isn't that kind of what happened here? Your Honor, under RPC 205, which is the rule of professional conduct interpretation or opinion, which is cited by defendants, addendum page 21, whenever a lawyer accepts a fee for referring a case to another lawyer, the lawyer remains responsible for the confident and ethical handling of the matter. He didn't refer this case to Jensen. Yes, Your Honor, he did. In the first instance, but he left the firm. Then the case went to the two remaining ones there. There was some sort of agreement that they would take it. Right? Your Honor, the first question... I just want to make sure I got that right. There was some agreement that the two remaining ones would take the case, would keep the case. Jensen left. The factual sequence was the referral was to Jensen, Rapp, Podhorn. For the first instance, agreed. Right. Then Jensen left. Right. The client had the election under the North Carolina Rules of Responsibility. The client had the election of who to go with. He chose to remain with the existing firm. So there's no referral to Jensen. He's gone. Your Honor, as a purely legal matter, we agree with you. But as an equitable matter, with respect to whether or not it would be inequitable for Mr. Jensen, who already had agreed that one-third of the recovery of the firm... He was going to get nothing. He left. He left the firm. That's the point I'm trying to understand there. What if these two lawyers had sent it to another lawyer altogether? You clearly would agree that there was no referral there. But you're saying because he once was part of his firm, and then they ultimately get him to come back and take it later on a totally different arrangement that there's some... Your Honor, respectfully, that's a factual question as to whether those circumstances make it inequitable for Mr. Jensen to take the fee. That's not even something that... He had no contact with the client, Mr. Jensen. The client has no contact in terms of the agreement that he makes with Jensen with the New York lawyer. When they make that agreement, it's totally separate. Your Honor... Now he doesn't even know about it, up to the point where he doesn't. And then he sends this $2,000 bill and says, well, what's going on in the case? I guess he never finds out because then you have a trial of this case. And then at the end of the trial, how much longer after the trial did he find out about the verdict? He found out, we allege in the complaint, he found out the following July. Which was how much longer? About, I think, 11 months. 11 months later, he finds out about a $5 million verdict for a client. Oh, it just... I don't know. But Your Honor, none of this... I'm just not seeing this clearly. I've been a litigator for a point. I couldn't imagine having a client that I would send to another state. And then it goes through this permutation. It's almost like... What it strikes me is like, I don't think he understood the value of this case. But somebody didn't understand the value of this case. You would not wait 11 months after a verdict apparently indicating you did not even know it. You didn't even know the trial. You had no indication of trial. Maybe it wasn't on the complaint in any instance. It's really a stretch. But Your Honor, you're referring to the one portion of Rule 1.5e that relates to active representation. The rules make clear, in fact... How do you get away from the rules and get into the equitable aspect of this? Because I, you know, I have to... The rules. Isn't that kind of a different basis? Two bases or is it all together, you think? Your Honor, respectfully, what you've been addressing isn't even a part of Judge Eagle's decision. What you've been addressing are the factual circumstances that may or may not make it inequitable for Mr. Jensen to retain... I probably would have addressed it had I been in Judge Eagle's position. Because I'm just blown away in terms of the connectivity with the lawyer on this case and what's going on in North Carolina. But it's that separation of Jensen from the firm that's really... If you want to address my concern a bit, other judges will have concerns too. Judge Eagle was saying there was no benefit conferred by Giuliano on the individual lawyer Jensen. Correct. What's wrong with that? Your Honor, it's improper to analyze this case as a matter under the traditional elements of unjust enrichment. Why? Because what we allege is that a constructive trust is what should have happened here. There should have been a constructive trust imposed on that portion of the fee that Mr. Jensen... What kind of malfeasance or what kind of wrongdoing was involved? None whatsoever, Your Honor. We don't allege any. As Judge Wynn wrote in the Pender v. Bank of America case just last year, no wrongdoing is required. My old case is coming back against me again. No, no. It's from this court, Your Honor. From this court. So you're saying that... So what do you need for a constructive trust? Your Honor, I'm glad you asked. Purely equitable considerations? The Houston v. Tillman case, which Judge Wynn relied on in the Pender case just last year, is the most recent expression from the Court of Appeals, although it was relied on the Supreme Court's decision in variety wholesaler. And they submitted a jury issue in that trial asking these three things. First, whether the property at issue, in that case a house and a vehicle... Okay, but before we get into facts and other houses and other vehicles, there has to be an inequity for a constructive trust to be conferred. I agree with that completely, Your Honor. Okay. What's the inequity here? The inequity is that Mr. Jensen agreed with my client when this case was initially referred to his law firm that my client was entitled to a referral fee of one-third of the ultimate fee. He agreed or the law firm agreed? The law firm of which he was the lead partner. He was certainly a one-third partner in that law firm at the time of that agreement. He knew full well. He prosecuted this Hazlitt case. And then he left the law firm and the case wound up on his doorstep because Mr. Pott Gordon, as we allege, knew that Mr. Jensen knew all about this case because he handled it. Let me ask one question. He left this law firm. Except he agreed initially. He left the law firm. Those two partners have recovered $5 million. Is Mr. Jensen going to be cut in on that? That's a separate question, Your Honor. I want to know the answer just with my own identification. That's between those two law firms. In fact, one of the cases we cited from the person... And if you see the legal basis he's going to get on based on these facts, he totally leads the law firm. And the agreement, I thought it was an agreement that then was made by the client. He would use those two lawyers there. And they would then take the case up to the exclusion of Mr. Jensen. No, Your Honor. What we allege in the complaint is different than that. In fact, what we allege upon information and belief is that the same agreement continued in effect. The mere fact that Mr. Jensen left didn't change the fact that the same representation agreement was still the one through which Mr. Haslett was being represented. But, Your Honor, getting back to your question, the standard under Houston v. Kilman is this. A circumstance which makes it inequitable for the defendant to retain the funds in question or the defendant acquired such funds in an unconscientious manner. Judge Eagles never in fact explored those questions because she held that we didn't state the elements for a claim for unjust enrichment, which is not what this case is all about. We are not claiming unjust enrichment in the traditional sense. We are claiming, and we believe it's a matter certainly beyond 12b-6, that Mr. Jensen should not have kept that fee to the exclusion of our client. We contend that is a question that gets us beyond 12b-6 and that there at least ought to be discovery on the question of... that he took this case knowing full well when it came to his new firm, he may have had communications with Mr. Platt-Morney, yes, I know, one-third of this fee is ultimately going to Mr. Jensen. Okay, so what was your claim then? You said you weren't stating a claim for unjust enrichment? Our claim is for constructive trust. Okay, but can you just... Is constructive trust a claim? It is a claim. Or is it a remedy? It is a claim, and Houston v. Kilman says so. In fact, Houston v. Kilman, the issue submitted to the jury, was solely constructive trust. There were no elements of unjust enrichment submitted to the jury. Brian? Okay, but if you have to have an inequity, and you're saying the inequity here is that two years or several years earlier he had agreed as part of a law firm to take a case, you're saying that's enough for the claim to survive? Yes, Your Honor. That Mr. Jensen knew full well, because he agreed with my client, when the case came to North Carolina, that one-third of this fee would be owed to my client. By the law firm? By the law firm of which he was the lead partner, yes. And it's no different than if he left the law firm. If he left the law firm and the case went with him, if the election were to him instead of to McGrath v. Borney, this analysis would be no different. We would state a claim, and it's ultimately up to the fact finder as to whether that is sufficiently inequitable to justify the imposition of a constructive trust. Your Honors, I see that my time is about up. I will await the Court's questions to my adversaries and come back on rebuttal and conclude my argument. Thank you. Thank you. Brooke O'Hara. May it please the Court. The plaintiff has asked the District Court to aid in the collection of a referral fee that violates the rules of North Carolina professional conduct. The District Court refused to do so, and its decision should be affirmed. As you know, I'm John Berkley Hammer. Along with Mr. Zaytoon, we represent John Jensen and his law firm, the Jensen Law Group. I will be addressing the issue of whether Rule 1.5E of North Carolina Rules of Professional Conduct is an absolute bar to plaintiff's claims, and if not, whether a plaintiff has accurately stated a claim on a merit or can otherwise pursue that claim. Mr. Zaytoon will address the issues of whether plaintiff has alleged a claim for unjust enrichment and whether he is entitled to a constructive trust. It is defendant's position that, one, compliance with Rule 1.5E is the only manner in which the plaintiff can recover a referral fee in North Carolina. Two, plaintiff failed to allege a claim for quantum merely, and his claim is nevertheless barred by the three-year statute of limitations in North Carolina. Three, plaintiff has not alleged the elements of a claim for unjust enrichment. And four, having done no work to secure a $5.7 million judgment, there is nothing unjust or unfair in denying plaintiff any of the attorney's fees that were earned by Mr. Jensen. This is particularly true when to do so would violate the ethical rules of North Carolina. With respect to Rule 1.5E, I think we agree that there are three requirements of the rule. With respect to this case, those requirements would be, one, that plaintiff remain ethically and financially responsible for the litigation. Two, that the client agrees with that arrangement, including the fee distribution, and that is confirmed in writing with the client. And three, the overall fee is reasonable. Plaintiff has failed to meet any of those requirements with respect to his relationship with Mr. Jensen. There is no written agreement between Mr. Jensen and plaintiff and his client. And plaintiff does not allege one. Plaintiff seems to want to import the prior agreement with the Jensen Law firm, or rather the former firm. He doesn't seem to do it. He said it directly. He does. It is a slight of hand. That was the agreement when they were, the three of them in this room had his firm, three names on it, that that was the agreement. And when he left, it basically stayed there. And there's no basis for that in the facts as alleged in this case. For example, we know that, as the court noted, when Mr. Jensen left that former firm, the client was advised where the case should go, and the client took the former firm, and Mr. Jensen left without it. Mr. Jensen had no contact with the client or the case for over 18 months. He was not referred to the case. The case came to him from Mr. Podgorny, not from the plaintiff. Mr. Jensen then signed a new fee agreement with Mr. Hazlett, and that fee agreement revoked all prior agreements among the parties, and there is no doubt that the client has every right to withdraw from the free agreement. When the New York lawyer referred the case to lawyers in North Carolina, did he maintain any form of an attorney-client relationship with that client? There is no allegation that he did, and there are no facts in the complaint that he did. For example, the amended complaint could have alleged, but did not allege, that he continued to work on the case, that he became admitted pro hac vice, that he paid for expert fees or depositions, could have alleged that he worked on the case by writing motions in limine or responding to motions in limine, could have alleged that he actually attended a hearing, or that he may have participated in a four-week trial by being second chair, providing support to Mr. Jensen. None of those facts are alleged. There is not one fact alleged that he participated in any fashion with respect to representing his client. To the contrary, as the court noted, Mr. Giuliano did nothing and sat back and waited. He did not know when the trial date was. He did not know that a trial had occurred. He did not know that funds were recovered. It would seem at a minimum to maintain your ethical responsibility to a client that you would know when his case is going to trial. And it is hard to imagine that any lawyer would stand here and say, I was ethically responsible for a case that I did not know went to a verdict for 11 months after it occurred. There is no fact in this complaint as amended that alleged compliance with the rules of the North Carolina Office of Professional Conduct at all. This case is governed by... Tell me again the facts in terms of what eventually led to Mr. Jensen and what was the nature of the agreements that happened there, because I think that's critical. It got this agreement initially, Mr. Jensen leaves the firm and something actually does happen, even though it's not clear. I mean, it seems like I've read the client then agreed to the two. Correct, Your Honor. As noted, the former firm sent out a letter to the client, gave him three boxes to check off. One would be stay with the current firm. Second would go with Mr. Jensen. Or third, go with another firm entirely. The client chose to stay. That's kind of required by the rules, isn't it? It is, Your Honor. The client chose to stay with the former firm. Mr. Jensen left, and he had no contact. As alleged in the complaint, he had no contact with this case for almost two years. Did Mr. Giuliano have any contact insofar as that arrangement? As far as the complaint alleges, there was no contact that Mr. Giuliano ever made except when Mr. Podgorny began to withdraw. He alleged that he spoke with his client about that, but he did not do anything until he sent that letter asking for his $2,000 in costs. And that's the only contact we have between Mr. Giuliano and Mr. Jensen over the course of the representation from Mr. Haislip. It seems as though Mr. Jensen really was trying to emphasize his separateness from the previous firm. I don't think he would engage until actually Mr. Podgorny withdrew. That's correct. He did nothing with respect to this litigation until Mr. Podgorny withdrew from the case, at which point he made an appearance and had a new fee agreement which revoked all of his prior fee agreements. But no one contacted Mr. Giuliano about any of this. The doctor called, neither Mr. Jensen nor the others. I believe Mr. Podgorny sent Mr. Jensen notice that he was withdrawing, and Mr. Juliano did not make an appearance in the case, did not come to protect his client. At that point, his client had no lawyer, with the case set for trial within months. When Mr. Jensen stepped in, the case was continued. He then took the case entirely to verdict without Mr. Giuliano setting foot in North Carolina or providing any effort whatsoever. It didn't even look like he knew what was going on. He absolutely did not, as far as the complaint is concerned. He absolutely did not, which, as I said, it was hard to imagine that you could be ethically responsible for a case and not know it's going to trial. But is that informative in any way from an equitable case where if a referral would not require, does a referral require you to contract, I know it's not a contract case, but would it require you to do anything in this case other than have a referral? Yeah, under the North Carolina Rules of Professional Conduct, absolutely. It requires him to remain ethically responsible and financially responsible for that litigation. And he could, and we've identified things that would make him ethically responsible or financially responsible. Pay the bills as they come due. Hire an expert, pay for the expert. Pay for depositions. Go ahead and help draft motions. Set in a trial. He did nothing to be ethically responsible for his client. And he paid nothing to be financially responsible. Rule 1.5E is very clear about the requirements of what he had to do. He had to have this in writing. He had to be ethically and financially responsible. And then the overall fee had to be reasonable. He has no contract with Mr. Jensen. He has no ethical responsibility or financial responsibility. He has completely failed in his ethical views toward his client. Yet he asked the district court to provide him over $700,000 for work he has no idea. He has violated the public policy in North Carolina. The Supreme Court of North Carolina in Thompson v. Thompson has made clear that a violation of the public policy with respect to a fee agreement bars any recovery. Thompson was a fee agreement case. The Court of Appeals in Thompson held that the fee agreement was void as a matter of public policy. Address the constructive trust thing here. Because North Carolina courts do recognize such a thing can exist if there is an unjust enrichment. Yes, if there is an unjust enrichment. Mr. Zaytoon is going to talk to that in depth. But to answer your question, Your Honor, yes. We believe there should be some inequity to impose a constructive trust. Usually the phrasing is fraud, breach of fiduciary duty, or some other unconscientious conduct, which could be wrongful conduct or other conduct. All of the cases cited by the plaintiff dealt with some either unlawful conduct or where the plaintiff had actually engaged in some services or provided something to the defendant that would be unconscionable not to have a constructive trust imposed. But this is not that case. So it's our view, Your Honor, that the case completely fails to meet the requirements of 145A. I'm almost out of time, so I'd like to address briefly the quantum error with the claim I made. Plaintiff in its brief, both before the district court and this court, argues that irrespective of everything else, we have a claim for quantum error. It has not been alleged. The complaint, as we hear now today, has got one claim for relief. If you look at page 15 of the committed complaint, it talks about unjust enrichment and constructive trust. There are 17 pages, 78 paragraphs, where quantum error is never mentioned. The conduct that Mr. Giuliano seeks to have quantum error for is conduct that occurred in New York. Interestingly, he does not allege that he's never been paid for that conduct. He simply alleges that I performed, I wrote some letters, I got prepared for a deposition, I answered some discovery, and so there's no basis. He actually filed a lawsuit up there in New York. He filed a lawsuit in New York. May I answer? Yes. He did file a lawsuit in New York, and we don't know the basis. I don't have that lawsuit, but we know he filed a lawsuit. But his lawsuit here for quantum error is barred by the North Carolina statute of limitations. It runs from the day of services. He hasn't performed services, any services, but the ones in New York haven't been provided since 2008.  May it please the Court. I'm Robert Zaytoon, and along with my co-counsel, John Berkelheimer, are privileged and honored to represent the law firm of John Jensen and John Jensen individually in this case. The plaintiff has attempted, and I stress attempted, to allege one cause of action. It was noted by Judge Keenan that a constructive trust is not a cause of action. In fact, it is a remedy to remedy an unjust enrichment. What the plaintiff has attempted to do in this case is to say that it is unjust for a lawyer who did all the work, who assumed all the risk, who paid all the costs, and who diligently represented his client to the point of going through a one-month-long jury trial. It is unjust for him to retain the fee pursuant to a valid contingency fee contract with the client. And instead, it is fair for a lawyer who did none of the work, who advanced none of the costs, who had none of the risks, and in fact, it must be implicit, had no contact with his client. If he didn't even know his client's cause had gone to trial until nine months after the verdict, that he should be paid essentially for writing two letters to the tune of over $750,000. That is what would be unjust. He says he's done a little bit more than that. He says the person was his client up in New York City. He pursued it up in New York courts, but then decided that a forum probably was not going to be convenient for him in the form of being. And then he found lawyers down in North Carolina, and he sought to make some arrangements. The client really did want this particular lawyer, Mr. Giuliani, in New York, because he maintained at least the connection with him. And in the process of it, if it had gone in the normal course of things, I suppose everybody would have been okay. But then you have this vision of the firm that causes the conundrum here, because Mr. Jensen then separates himself from the firm, and then you've got something that occurs with the client and the individual. So, I mean, when you look at it, it's not as though he just sat on the sideline and said, you know, I want some money. Basically, it's kind of a, you wouldn't have gotten this case if it wasn't for me. And I sort of identified it and brought it to you and put it in your lap. And now you've got $5 million from something that you got totally from me, from the inception, and you want to give me my little $2,000 rather than the $5 million, a $2 million fee. That's what he's saying, isn't it? That is what he's saying, Your Honor. There's a little appeal to it. I mean, when you think about it from the perspective of, I mean, he could have done a lot more. There's no question in my mind. It just seems totally unreasonable. A lawyer who would have a case of this nature wouldn't know that this thing is going to trial. What a mistake. I'm blown away with that. But aside from all that, when you look at the fact that all these three lawyers were there, I don't know how he got them, but he got the three lawyers there, and apparently all great lawyers, and it was going fine until you had this little thing that happened with the firm. And the New York lawyer didn't have anything to do with that firm breaking up that way. It didn't have anything to do with the fact that these three lawyers or the firm went through those permutations. Had they done what they were supposed to do, he'd have his feet. Well, Your Honor, the rules of professional conduct and the real world as it relates to representing clients is very client-centric. It is true that initially Mr. Hazlitt did choose Mr. Giuliani as his attorney in New York, but that matter came to an end. It was dismissed. What Mr. Giuliani did is secure counsel, a law firm in North Carolina, to handle the case. He did not follow the case in terms of Provoct Viche. He referred the case to a law firm. Actually, he referred the case to Mark McGrath, who was the attorney who had some connection with him. In any event, Your Honor, Mr. Jensen actually worked on the case during the time it was there, yet he left the firm. And when a lawyer leaves the firm under our Code of Professional Responsibility, the client has the choice of which lawyer is going to represent him. And in the record in this case, as Your Honor noted, the client actually signed. There was a letter that went to the client giving Mr. Hazlitt the choice of what law firm to go to, and the client actually signed a document that said, I reject Mr. Jensen as my attorney and I will remain the client of the McGrath or Gorney law firm. At that point, notwithstanding that Mr. Jensen also retained no residual percentage for recovery, if that case did go to a recovery. He had no financial interest in the case once he left, nor did he have any legal responsibility because he was not the attorney for Mr. Hazlitt. Is that clear? That he would have had no claim and that the two remaining lawyers had gotten a $5 million verdict given the fact he had worked on that case so much? Is it clear that he would have had no interest? He would have had no interest because in his leaving the firm, he did not retain any interest. That was a part of his leaving the firm. He left the firm and he left that case, and any risks and benefits that case may entail to the lawyers who remain. And then, Your Honor, there is a nearly two-year gap where Mr. Jensen had no contact with Mr. Hazlitt, had no contact with Mr. Giuliano. He was going about his practice of law in his firm, and Mr. Giuliani did nothing to contact Mr. Jensen whatsoever. He did nothing really to contact his own client. The only indication that he had any notice about the case, the status of the case is when Mr. Pergorni sent him the copy of the consent order to withdraw. And as an attorney getting that order, he would see that my client or the client that I referred to the initial firm has no lawyer. And it is clear he did nothing to step in when Mr. Hazlitt was pro se at that point to aid his client. The point being, though, that when Mr. Hazlitt then came to Mr. Jensen, saw him as his attorney, they signed a new fee agreement in which Mr. Hazlitt revoked all previous fee contracts. And interestingly, the case was in a different posture at that point than it was when it first came in. It was still very speculative as to whether or not there would ever be a recovery and ever be a fee. As a lawyer having represented plaintiffs in many, many occasions, I can tell you the only thing that is guaranteed is that you have to work hard and you have to put in the time and hopefully all that will inure to the benefit of your client. But it is very speculative when it comes in, the case comes into the firm. It was even more so because at the time that Mr. Hazlitt came to Mr. Jensen, the case was set for trial. The case had been litigated for two years without Mr. Jensen's contact with the case. And I think that if you look at the fee contract that was entered into with Mr. Hazlitt at that time, it was for a 40 percent recovery in that there was a recovery. The initial contract that was signed with the firm two years earlier was for one-third. So in essence, Mr. Giuliani is getting a raise here because his claim for relief is one-third of the fee that Mr. Jensen ultimately obtained through his hard work, through his toil, through his risk-taking, and with no assistance from Mr. Giuliani. Now, we believe that Judge Eaglesbelow rightly found that there was a violation of Rule 1.5, and Mr. Giuliani knows that he has no contract claim, he has no fee agreement to stand on, he has a public policy issue that is overwhelming against him, and so he attempts to allege a garden, not a garden variety unjust enrichment case. I don't know, that's not a legal term of art in my understanding, but the garden, no matter where it is, has to be toiled, has to be watered, has to be fertilized, tilled, and then there will be a result hopefully in the way of a crop, and nothing can be done unjustly to obtain the benefits of that effort. There is nothing unjust that John Jensen and his firm did in this case to justify him having to pay Mr. Giuliani his one-third fee, one-third percentage of the fee. Judge Eagles rightly found that there was no benefit on Mr. Jensen, nor did Mr. Jensen accept any benefit from Mr. Giuliani. A client is not chattel where a lawyer obtains an ownership interest in the client, and no matter where the client goes, that lawyer has a financial interest in that client's case. That is directly against what our Code of Professional Responsibility and the laws of unjust enrichment proclaim. I'm out of time, so, Your Honor. There's a misperception as to what a referral fee is. Comment 8 to Rule 1.5e of the Revised Rule of Professional Conduct makes it very clear, quote, most often this referral fee is used when fee is contingent and the division is between a referring lawyer and a trial specialist. In other words, this is to recognize that some lawyers get these cases and don't have the confidence to handle them. Now, that may not be the case here. Here it's more a geography question. But that's the point of what a referral fee is. A referral fee is not, let's get in this and do this together. It can be. That's one option. But the other option is where the first lawyer remains on the financial and ethical hook. And that financial and ethical hook is simply to be there to step into the breach if there is a breach. And we have alleged all over the complaint that when there was a breach, when Mr. Platt-Horton said to Mr. Hazlett he couldn't represent him anymore, at that point in time we have about six paragraphs alleged in our complaint as to what our client did to make sure that Mr. Hazlett had representation at that point. That was his only responsibility was to remain ethically and financially responsible. If Mr. Jensen had requested money, yes, my client had an obligation to help fund the case because he was financially responsible. That responsibility started the day he was retained, which was 16 months before the case was transferred to the North Carolina firm, with Mr. Hazlett saying, both of you are involved at this point. My client had an attorney-client relationship with Mr. Hazlett. And this notion that my client lost touch and didn't pay attention is simply belied by the complaint that we filed. The complaint that we filed includes an October 25, 2012 letter, which was less than a month after Mr. Jensen in his new law firm wound up with this case. And Mr. Giuliano has said, I am kindly advised regarding the status of this matter to wit, whether or not the case has been settled. If not settled, has it been placed on the trial calendar? Not one, but two letters, page 202 of the joint appendix and page 131 of the joint appendix, note one. Two letters written. Why did my client know this case was scheduled for trial? Because Mr. Jensen didn't tell him. Because Mr. Jensen was trying to get away with not paying this fee. And, Your Honor, I think you were exactly right. The whole notion, and it certainly can be inferred on 12b-6, the whole reason why Mr. Jensen wanted there to be this disconnection between the Podgorny firm through the withdrawal and him taking the case for his new firm was to be able to say, later down the road as he is now, this had nothing to do with the Podgorny firm. I took this man when he was cast away on the street, and he just found him. It had nothing to do with my prior representation to him. That is why he wanted, certainly inferrable from the complaint that we filed, that that is why he wanted the withdrawal. He wanted to be as clean as possible. So the very argument that we're making, that he can't in equity and good conscience take 100% of this fee when he had agreed years before when this case came to North Carolina, one-third of the fee that was retained would be paid to my client. In equity and good conscience, which it is a claim for relief in North Carolina, the Houston v. Killen case says that. The Variety Wholesalers case says that. You don't have to have all of the elements for unjust enrichment. You don't have to have the benefit conferred. We are not claiming that Mr. Jensen is a wrongdoer, but what we are claiming is that the way referral fees work and the way that our state bar recognizes referral fees to work, he had an obligation to pay this referral fee, and there was nothing wrong with my client waiting to receive that referral fee and being there to step into the breach. And I specifically want to mention paragraphs 37, 46, 47, and 51, all of which talk about what our client did the one moment in time after the case was referred to these North Carolina lawyers when there was a breach for our clients to step into. That is what the ethical responsibility of my client was. He fulfilled that ethical responsibility when it occurred to make sure that Mr. Hazlitt had representation in North Carolina. Don't let me leave you with this notion in my mind of why it was approached in this way. And that is, if Mr. Giuliano, if the two lawyers who had this case had taken this on trial, then there would be a pretty strong case for Mr. Giuliano in terms of referral. That's not the purpose. So the case goes to Mr. Jensen, and when it goes to Mr. Jensen, isn't the action already in court? Is it already in court and filed? It was not. It had been dismissed. So it got dismissed. So they dismissed it, and then he refiled. I'm sorry. I take that back. I got that fact wrong. It was. It was on a trial calendar, and it got continued off of that trial calendar because of Mr. Pogborni's motion to relieve withdrawal. So my question is, for the time period that it was transferred, it was on the calendar. I believe that was in July of 2012 when he asked for the withdrawal. Right. And the trial occurred in October of that same year. Is that right? No, it was supposed to. It got continued. So the whole notion of getting the withdrawal. When was it actually tried? It was tried the next summer, the summer of 2013. That's not a reasonable fact. You've got to be clear. Okay. And as to the statute of limitations, real quickly, Crumley v. Peave makes clear that the claim doesn't even approve until the second lawyer recovers the fee. So in terms of quantum merit, there's no statute of limitations that ran because that fee wasn't recovered until 2013. Your Honors, thank you so much for your time. We ask that you reverse and remand for this case to proceed. Thank you. I'll ask the clerk to adjourn the court, and then we'll come down and re-counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: William B. Traxler, Jr., Barbara Milano Keenan, James A. Wynn, Jr.